## OPELIKA SEWER CO. v. CITY OF OPELIKA.

(District Court, M. D. Alabama, E. D., at Opelika. April 3, 1922.)

**Municipal corporations ⬅711—City held without power to make contract fixing unchangeable rates for sewer company.**

Under Const. Ala. § 22, providing that "every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment," the Legislature cannot confer on a municipal corporation power to make a contract fixing unchangeable rates to be charged by a public service corporation, and rates fixed by an ordinance granting a franchise to a sewer company are not enforceable when shown to be confiscatory.

In Equity. Suit by the Opelika Sewer Company against the City of Opelika. On motion by complainant for preliminary injunction and by defendant to dismiss bill. Motion to dismiss denied, and injunction granted.

Barnes & Walker, of Opelika, Ala., and Steiner, Crum & Weil, of Montgomery, Ala., for plaintiff.

N. D. Denson & Sons, of Opelika, Ala., for defendant.

CLAYTON, District Judge. The plaintiff, Opelika Sewer Company, a public utility corporation, alleges in its bill that the defendant, city of Opelika, in April, 1902, adopted an amended ordinance granting to the Sanitary Sewer Company of Philadelphia, and its successors, permission to construct, operate, and maintain a sanitary sewerage system in the city for a period of 30 years. Section 6 of the ordinance provided that the sewer company, and its successors, are "authorized to

charge not in excess of the following annual rates for sewerage service, which said rates may be collected quarterly in advance." Then follows the schedule of rates. The ordinance contains other provisions usual in such case and is made an exhibit to the bill.

It is also alleged that the plaintiff, having acquired all the rights of the Sanitary Sewer Company under the ordinance, in the year 1902 constructed and has since operated and maintained in the city of Opelika a sanitary sewerage system and disposal works, serving the city and its inhabitants, and charged until January 1, 1922, the rates specified in the ordinance. It is averred that the fair and reasonable value of the plaintiff's investment is approximately $170,000, and that it has issued and has outstanding $70,000 of 5 per cent. interest-bearing bonds; that during the period from January, 1904, to December, 1920, the gross receipts of the company were approximately $58,800, while its actual operating expenses for the same period were something over $38,000, and the accumulated interest on the bonded indebtedness amounted to about $59,500; that its gross operating receipts during the year 1921 were about $5,300, and its operating expense about $3,-200; and that the receipts and operating expenses would be practically the same for the current year. It is further stated that the accrued and unpaid interest on its bonded indebtedness amounts to more than $36,000, and that the plaintiff is otherwise indebted for current expenses for the maintenance and operation of the sewer system in the sum of $7,500, and that, although this system has been managed and operated as economically as possible, the plaintiff has at no time during its operation been able to earn any dividend whatever on its investment of $170,000, or on its capital stock of $50,000.

The rates prescribed in the ordinance of April 22, 1902, are alleged to be confiscatory, because inadequate to afford a fair return upon the reasonable value of plaintiff's property employed in the service, and that, if compelled to continue the service under the rates named in the ordinance, it would result in the taking of the plaintiff's property without just compensation, in violation of the Fourteenth Amendment of the Constitution of the United States.

Further, it is alleged that in an effort to relieve the situation, and in a measure provide for revenue commensurate with the service, and to insure in some degree a fair return upon the plaintiff's property employed in the service, and with the hope of obtaining the co-operation of the city and its authorities, plaintiff petitioned the city council of Opelika for permission to increase its rates according to the schedule set forth in its petition, which is made an exhibit to the bill, and that, although the facts stated therein were not controverted, the petition was denied, and that thereupon the plaintiff, upon advice of counsel, promulgated and put into effect the rates named in its petition, and these are alleged to be fair and reasonable to the city and its inhabitants, and necessary to the continued operation of the plaintiff's system or plant.

It is charged that thereupon the mayor of the city of Opelika caused notice to be published in the newspapers, advising and warning the citizens of Opelika not to pay plaintiff's increased rates, and that as a

consequence practically none of the plaintiff's patrons are paying anything; that the only feasible way for collecting for the plaintiff's service is to discontinue the service, which it is averred would result in innumerable suits for damages, great annoyance, and expense, and that in order to shut off any such customers it would be necessary to dig up the sewer connections in the streets or alleys in the city, and that the mayor has ordered the police officers to arrest any of the plaintiff's employees who attempt to dig up any portion of the streets of the city for such purpose; that the city is threatening to take steps to annul the plaintiff's franchise, which would destroy or greatly impair its credit and seriously embarrass its financial operations, and would result in irreparable injury to the plaintiff.

The prayer of the bill is for injunction pendente lite, which is asked to be made perpetual on the hearing, restraining the City of Opelika, its officers, agents, and servants, from interfering with the plaintiff in the enforcement of the rates prescribed by it, and for general relief. The defendant has not answered, but moves the dismissal of the bill upon the ground that it is without equity, and upon the further ground that the plaintiff by its continued service has acquiesced in the ordinance rates, and is therefore estopped from questioning the rates.

Plaintiff's contention is that the ordinance does not constitute a contract between the plaintiff and the defendant, in so far as it relates to the rates, and for the reason that (1) the city had no charter power to thus contract; and (2) that, if the Legislature has granted such power, the grant is in conflict with section 22 of the Constitution of 1901 of Alabama, and therefore ineffective. And the defendant insists that the ordinance constituted a valid and binding contract, and that the rates therein stipulated cannot be changed without its consent. The Public Service Commission of the state has no jurisdiction over utilities of the character here involved.

The jurisdiction of this court is invoked under the Fourteenth Amendment of the Constitution of the United States, which prohibits the taking of property without just compensation. Columbus Ry., L. & P. Co. v. City of Columbus, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648. The charter of the city of Opelika provides that the municipality has the power—

"to establish and build drains, sewers, conduits and reservoirs and to regulate the same," and "to authorize the use of the streets of the city for horse, steam or electric railroads, and to regulate the same and to attach conditions to any franchises, and to compel such companies to make and to keep in repair such parts of the streets, bridges and crossings upon which their cars run as the board may deem proper, to regulate the use of the streets for the erection of telegraph, telephone, electric and all other systems of wires, and conduits and to require the same to be placed under ground if deemed necessary for public convenience or safety," and "to maintain the health and cleanliness of the city, and to this end, to adopt and maintain an efficient system of sewerage, to adopt such ordinances and regulations as the board shall deem necessary or expedient for the protection of health and to maintain a good sanitary condition in public places and on private premises."

The plaintiff insists that the rates specified in the ordinance granting the franchise is not a contract, but merely a schedule of rates, subject to change, and that these rates are so low as to be confiscatory. On

the other hand, the defendant insists that the rates stipulated in the ordinance are an inseparable part of the franchise contract and, are binding upon the plaintiff.

The rule, well established in reported cases, is that, if the rates fixed in a statute, ordinance, or order of a commission are so inadequate that their enforcement would be equivalent to the taking of property for public use without just compensation to the owner, they should not be observed, and because there must be afforded a fair return upon the property at the time of its use for the public benefit. In recognition of this rule the Supreme Court said in Newton v. Consolidated Gas Co. of N. Y. (March 6, 1922) 257 U. S. ——, 42 Sup. Ct. 264, 66 L. Ed. ——, that:

"The general doctrine applicable when rates are alleged to be confiscatory . has been so often stated that present discussion of it is unnecessary. Knoxville v. Water Co., 212 U. S. 1; Willcox v. Consolidated Gas Co., 212 U. S. 19; Des Moines Gas Co. v. Des Moines, 238 U. S. 153; Rowland v. St. Louis & S. F. R. R. Co., 244 U. S. 106; Denver v. Denver Union Water Co., 246 U. S. 178; Lincoln Gas Co. v. Lincoln, 250 U. S. 256."

In Home Tel. & Tel. Co. v. Los Angeles, 211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed. 176, the Supreme Court had under consideration the question here presented. There the charter of Los Angeles granted to the city the power to "regulate telephone service in the use of telephones within the city and to fix and determine the charges for telephones and telephone service and connections," and other comprehensive powers in this connection were contained in the charter. In that case the court held that, while these provisions were sufficient to authorize the exercise of the governmental power of regulating charges, they gave no authority to enter into a contract to abandon the governmental power itself. This case has been repeatedly followed. Milwaukee Ry. Co. v. Commission, 238 U. S. 181, 35 Sup. Ct. 820, 59 L. Ed. 1254; Winchester v. Winchester Waterworks, 251 U. S. 192, 40 Sup. Ct. 123, 64 L. Ed. 221. In the case of Knoxville Gas Co. v. City of Knoxville (C. C. A.) 261 Fed. 283, where the question is fully discussed and authorities collated, the Circuit Court of Appeals, in discussing the provision of the charter, broader than those here involved, said:

"The power to fix rates to be charged by public service corporations * * * is governmental, and resides primarily in the state, and municipalities cannot exercise such power, unless the state has in fact surrendered its power in that behalf. It is the settled * * * rule that a state's surrender to a municipality of power irrevocably to fix rates for a public service corporation must appear in explicit and convincing terms, and all doubtful expressions are to be resolved in favor of the state and against surrender of the power."

This was also the holding of the court in the case of O'Keefe, Receiver, v. City of New Orleans (D. C.) 273 Fed. 560, affirmed 280 Fed. 92. In Ottumwa Ry. & Light Co. v. City of Ottumwa (Iowa) 178 N. W. 905, the court said:

"In fewer words the cases proceed on the general theory that it is against public policy to contract for unchanging rates; that there must be no such contract because its enforcement might, on the one hand, fasten what proves to be an exorbitant charge upon the patrons, or, on the other, prove a rate that will confiscate the property of the service corporation. While there are

other lines of reasoning advanced in the authorities, in the main and at the present time, the decisions run on the broad ground that public policy forbids such contracts, unless the Legislature, the ultimate judge of what is public policy, declares unmistakably that such contracts do not offend that policy."

In that case it was held that a 5-cent fare provision in the franchise ordinances did not constitute a binding contract, and the court restrained the city from interfering with the railway in increasing its rate of fare. It seems to me that the reasoning in Denver v. Stenger (decided by the Circuit Court of Appeals, Eighth Circuit, December 29, 1921) 277 Fed. 865, must be followed in the instant case. There the District Court, whose ruling was affirmed, enjoined the city of Denver from enforcing a maximum fare fixed by ordinances and the city insisted that:

"The acceptance of the ordinances and franchises under which the tramway company * * * operates a street railway in the city * * * constituted contracts binding upon both parties, * * * and that * * * there was power to make them, * * * and that they are valid and binding as contracts until the city * * * thinks proper to change the rate."

And the appellate court said:

" * * * The only important question raised upon the record * * * is as follows: Is there an existing contract between appellant and the tramway company, in virtue of which the tramway company is bound to carry passengers for the fares prescribed by the ordinances and franchises mentioned. * * * These ordinances were not contractual in form nor in substance. Subject to constitutional limitations, the city and county of Denver had the power to change the fares at any time. These ordinances to which reference is now being made granted the tramway company nothing. They were limitations upon the power of the tramway company to fix its own fares. So the Tramway Company accepted nothing that it was not compelled to accept, if the fares were not confiscatory. We are of the opinion, therefore, that they did not constitute contracts binding upon either party, so far as the question of fares was concerned. * * * These ordinances provided a fare of five cents for a single passage on any line of the tramway company. They were not contractual in form, but they did grant rights of way as above stated, which were accepted by the tramway company. It is claimed by appellant that the five-cent fare was a condition of the grant, and its acceptance created a binding contract on the part of the tramway company. * * * These ordinances were not contractual in form, and, adopting the construction placed upon the same by the appellant we do not see how they could be called contracts binding upon both parties. * * * If however, the appellant can at any time change the fares—in other words, refuse to be bound by the contract—how does more delay cure the lack of mutuality? A party to a contract is bound, or he is not bound, from the time of its execution. To say that a party is bound as long as he wants to be bound simply means that he is not bound at all. Upon the question of whether the parties to these ordinances intended to contract, and upon the question as to whether, if there was a contract, it would be void for want of mutuality, the following cases seem to us to be decisive against the claim of appellant: Home Telephone Co. v. Los Angeles, 211 U. S. 265; Puget Sound Traction Co. v. Reynolds, 244 U. S. 574; Rogers Park Water Co. v. Fergus, 180 U. S. 624; San Antonio Public Service Co. v. City of San Antonio, 257 Fed. 467; City of San Antonio v. San Antonio Public Service Co., 225 U. S. 547; Central Power Co. v. City of Kearney, Court of Appeals, Eighth Circuit, opinion filed July 13, 1921; City of Dallas v. Dallas Telephone Co., 272 Fed. 410.

And numerous other cases are cited.

In the same case, Denver v. Stenger, supra, the provision of the Constitution of Colorado is quoted in these words:

"The right of eminent domain shall never be abridged, nor so construed as to prevent the General Assembly from taking property and franchises of incorporated companies and subjecting them to public use, the same as the property of individuals; and the police power of the state shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the state."

And the court concludes that:

"We are of the opinion that the quoted provisions of the Colorado Constitution, under the interpretations given similar provisions in the Constitutions of the states of Texas, Missouri, and Louisiana, the Code of Iowa, and statutes of Nebraska, clearly prohibit the making of a contract suspending the power of the city and county of Denver or the city of Denver to regulate the fares of the tramway company. The history of the litigation in regard to the constitutional provisions of the state of Texas is to be found in San Antonio Traction Co. v. Altgelt, 200 U. S. 304; San Antonio v. San Antonio Public Service Co., supra; San Antonio Public Service Co. v. City of San Antonio, supra; City of Dallas v. Dallas Telephone Co., supra. The case of State ex rel. City of Sedalia v. Public Service Comm., 275 Mo. 201, construes the Missouri Constitution.   Southern Electric Co. v. City of. Chariton, 255 U. S. 539, construes the Iowa Code.   Central Power Co. v. City of Kearney, supra, construes the statute of Nebraska.   O'Keefe v. City of New Orleans, 273 Fed. 560, construes the Louisiana Constitution.   The public policy of the state of Colorado, as shown by her Constitution, statutes, charters, and decisions, is opposed to the contracting away of the power of regulating and fixing rates of public utilities through the exercise of the police power.   The claim that the legislative power of the city and county of Denver is not subject to the provisions of the Constitution of Colorado is not supported by reason or authority.   The trial court having for just cause enjoined the rates shown to be confiscatory, and the council of the city and county of Denver refusing to make any other rates than those enjoined, it became necessary, in order to operate the tramway company, to make some provision in regard to rates.   Of course, the court had no general power to regulate or make rates or fares for the tramway company, but it was its duty to make some order to prohibit the tramway company from charging what it pleased, and therefore to fix certain rates which the receiver should not exceed—these being only temporary for the purpose of the receivership.   We think the trial court acted in the premises clearly within the law and the facts, and the order granting the temporary injunction, and refusing to dismiss the appellee's petition, should be affirmed; and it is so ordered."

The settled rule in Alabama is that:

"Municipal corporations can exercise only such powers as are expressly granted in their charter, or such as may be necessary and proper to carry such express powers into effect, including such as are indispensably necessary to the declared objects and governmental purposes for which such corporations are created.   And any reasonable doubt as to the existence of a power claimed to be conferred by the charter will be resolved by the courts against the corporation, and in favor of the public."   Birmingham, etc., Co. v. Birmingham, etc., Co., 79 Ala. 465, 58 Am. Rep. 615.

If, however, the Legislature had granted or attempted to grant such power to the municipality as here claimed, manifestly, its act would have been in violation of section 22 of the Constitution of Alabama, which provides:

"That no ex post facto law, nor any law impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the Legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."

The language employed in this provision of the fundamental law of the state is comprehensive, and its purpose as well as its meaning is plain. The Supreme Court of Alabama in discussing this provision, intimated, in some of its decisions, that legislative power might be granted to contract for fixed rates for a reasonable period, but in City of Mobile v. Mobile Electric Co., 203 Ala. 574, 84 South. 816, considering the power to make grants and contracts of this character, declared that:

"This power can neither be abdicated nor bargained away, and it is inalienable, even by express grant; that all contracts and property rights are held subject to its fair exercise."

In the former appeal of this case, 201 Ala. 607, 79 South. 39, L. R. A. 1918F, 667, the court said:

"The municipality cannot, in the exercise of its delegated contractual right, perpetually or for an unreasonable time fasten upon the taxpayers and inhabitants rates and obligations that cannot be changed or regulated during reasonable intervals so as to meet changed conditions and thereby avoid extortion and oppression."

And in Birmingham, etc., Co. v. Birmingham, etc., Co., supra, wherein the Supreme Court was considering section 23 of the Constitution of 1875—a companion to section 22 of the present Constitution though not so comprehensive as the latter section—it was held that neither the charter of the city of Birmingham, nor the general statutes conferred on that corporation the power to grant by ordinances in the nature of a contract, the exclusive franchise in perpetuity for running a street railway through certain designated streets and avenues of the city, and that, if such power were granted by its charter or any public statute, it would be violative of that constitutional provision against the passage of any law "making any irrevocable grant of special privileges or immunities."

There is nothing in Weller v. Gadsden, 141 Ala. 642, 37 South. 682, 3 Ann. Cas. 981, cited by counsel for defendant, opposed to this view. The question here presented was not under consideration there, and while it was said in that case that the latter clause of section 22 of the Constitution had reference to grants and the revocations, alterations, and amendments thereof by "the Legislature," it is difficult to perceive how, if the Legislature is prohibited from making such grants directly, it would have the power to make them indirectly by delegating the authority to the municipality. The court in that case recognized that the Constitution reserved in the Legislature the power to revoke, alter, or amend such franchises.

Decisions of state courts relating to matters of local law, such as the construction of a state Constitution and statute, and the power of local municipal corporations, must be regarded by the federal courts as controlling, when their application involves no infraction of any right granted or secured by the Constitution of the United States (Old Colony Trust Co. v. City of Omaha, 230 U. S. 100, 33 Sup. Ct. 967, 57 L. Ed. 1410), except, of course, as has been aptly said:

"It cannot be expected that this court will follow every such oscillation, from what ever cause arising, that may possibly occur." Gelpcke v. Dubuque, 68 U. S. (1 Wall.) 175, 17 L. Ed. 520.

280 F.—11

The case of San Antonio v. San Antonio Public Service Company, supra, is in point, and would seem to be conclusive of this question. The court in that case had under consideration a provision of the Texas Constitution, practically the same as section 22 of the Alabama Constitution, except that the latter is perhaps more rigid. The court unequivocally held that the Legislature of the state of Texas was prohibited by the organic law of that state from granting a municipality power to .contract for fixed rates to be charged by a public utility corporation, and in Southern Iowa Electric Co. v. Chariton, 255 U. S. 539, 41 Sup. Ct. 400, 65 L. Ed.764, that court said:

"The right of a municipality to regulate street railway fares gives no power to violate the United States Constitution, Fourteenth Amendment, by enforcing a confiscatory rate."

Section 228 of the Constitution of Alabama, cited by counsel for the city, has no application. That section is a limitation upon the power of cities and towns of more than 6,000 population (a class to which the city of Opelika does not belong) to grant certain franchises for a longer period than 30 years, and does not in any manner conflict with section 22. I am therefore constrained to hold that the city of Opelika did not make or have power to make irrevocable rates to be charged by this public utility, and it appears that the ordinance rates are unreasonably low.

It follows that the motion to dismiss the bill must be denied (see footnotes to rule 29 [3d Ed.] Hopkins' New Fed. Eq. Rules), and that interlocutory injunction must issue. Accordingly it will be so ordered.