## GELLER v. DALLAS RY. CO. (No. 8942.)*

(Court of Civil Appeals of Texas. Dallas. Oct. 28, 1922. Rehearing Denied Nov. 18, 1922.)

1. **Carriers** ⊜➡12(9)—Rate schedule in street railway company franchise held not a fixed contract but subject to revision.

A provision in a franchise of a street railway company, prescribing a schedule of passenger rates, and designating five cents as the fare to be charged, held but a rate schedule subject to revision from time to time by the city board of commissioners, and not a fixed contract binding for the life of the franchise; Const. art. 1, § 17, declaring that no irrevocable or uncontrollable grant of special privileges or immunities shall be made.

2. **Municipal corporations** ⊜➡108—Ordinance regulating street railway rates need not be submitted to referendum as grant of franchise.

Where a street railway company had been granted a franchise by city ordinance, fixing fares to be charged and subsequently another ordinance was enacted altering the rate schedule prescribed in the franchise, held, that such subsequent ordinance need not be submitted to a referendum on the ground that it granted a franchise.

3. **Municipal corporations** ⊜➡63(1)—Ordinance passed as emergency measure when not so in fact subject to judicial review.

Where a city charter provides that ordinances may be passed as emergency measures when required by the general state laws, by

provisions respecting street improvements, and for the immediate preservation of the public peace, health, or safety, the board of commissioners of the city cannot declare that an emergency exists except in the enumerated cases, and when a board exceeds its authority and there is in fact no emergency, its action is not binding, but is subject to judicial review and determination.

**4. Municipal corporations ☞108 — Ordinance increasing street railway rates without referendum held not valid as emergency measure.**

· Where the board of commissioners of the city passed an ordinance increasing street railway rates as an emergency measure, without submitting the ordinance to a referendum, *held* that, as the immediate preservation of the public peace, health, or safety was not at stake so as to require a suspension of the ordinary methods of putting ordinances into effect, no emergency existed.

**5. Municipal corporations ☞111(1) — Ordinance erroneously enacted as emergency measure held not void but merely suspended.**

An ordinance passed by a board of commissioners of a city increasing the street railway rates as an emergency measure, when in fact no emergency existed, *held* not void but merely inoperative until published for 30 days, as required by the city charter and ratified by a referendum if demanded.

**6. Carriers ☞18(6) — Plaintiff suing to restrain ordinance increasing rates held to have no adequate legal remedy by mandamus or otherwise.**

Where a city board of commissioners passed an ordinance as an emergency measure increasing street railway rates, an elector and citizen, and patron of the railway company *held* entitled to sue to restrain the operation of the ordinance, on the ground of invalidity, he having no adequate legal remedy by mandamus because of the declaration of the emergency, the provision that the ordinance should take immediate effect cutting off his right to˙file protest and to proceed thereunder.

Appeal from District Court, Dallas County; John W. Pope, Special Judge.

Suit by F. J. Geller against the Dallas Railway Company. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

W. S. Bramlett, of Dallas, for appellant.

Templeton, Beall, Williams & Worsham, of Dallas, for appellee.

SERGEANT, C. J. On January 8, 1917, the city of Dallas, acting through its governing authorities, the mayor and board of commissioners, granted to C. W. Hobson, his associates and assigns, a franchise containing the right to use the streets of said city for the purpose of maintaining an electric street railway system. The franchise ordinance provided that it would take effect when submitted to and approved by a majority of the qualified voters of the city of Dallas. Pursuant thereto, the ordinance was submitted and approved and then accepted in writing by the grantee. Later, appellee, by purchase from Hobson and associates, acquired the street railway system and franchise. Section 24 of this franchise prescribes a schedule of rates for carriage of passengers and designates five cents as the fare to be charged.

On June 24, 1922, the mayor and board of commissioners of the city of Dallas enacted an ordinance changing the schedule of rates to be charged by appellee and raising the fare to be charged its passengers from five cents to six cents. The ordinance declared the existence of an emergency, was passed by a four-fifths vote, was not submitted to a referendum, and was declared to take effect immediately upon its passage.

On September 8, 1922, appellant, alleging himself to be an elector, voter, and citizen of the city of Dallas, Tex., and a patron of the Dallas Railway Company, thereby showing his legal capacity to sue, brought this action in the district court of the Forty-Fourth judicial district of Texas, at Dallas, contending that the ordinance of June 24, 1922, raising the street car fare to six cents was void on the ground that the franchise of January 8, 1917, was a contract and bound appellee during the life of the' franchise to a five-cent rate; that the ordinance of June 24, 1922, was an "ordinance granting a franchise" and therefore, not valid under the charter of the city of Dallas, until submitted to, and ratified by, the qualified voters of the city of Dallas at a referendum; and upon the further ground that no emergency existed requiring the law to take immediate effect; that the declaration in the ordinance declaring an emergency was subject to judicial review, and that 30 days must elapse for publication of the ordinance after its passage before it could take effect.

Appellant further prayed for temporary and permanent writs of injunction to restrain and enjoin appellee from collecting the six-cent fare. The record discloses no action of. the court on the prayer for injunction further than the granting of an order to show cause.

Appellee. answered by general demurrer, special exceptions to the petition, by general denial, and to the merits of the case, alleging, in substance, the validity of the six-cent ordinance. On hearing, the trial court sustained appellee's general demurrer and special exceptions and dismissed the case. From this judgment appellant brings the case to this court by appeal.

[1] The first question for our determination is whether section 24 of the franchise ordinance of January 8, 1917, prescribing the rate of fare to be charged by appellee was a fixed contract binding for the life of

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the franchise, or whether it was but a rate schedule subject to revision from time to time by the legislative branch of the municipal government. We are of the opinion that it was merely a rate schedule. The Constitution of Texas of 1876, art. 1, § 17, declares that—

"No irrevocable or uncontrollable grant of special privileges or immunities shall be made; but all privileges and franchises granted by the Legislature, or created under its authority, shall be subject to the control thereof."

Municipal corporations are created by and under the authority of the Legislature with their powers defined in the charters which create them. The charter of the city of Dallas, art. 2, § 8, subsec. 27, states that—

"The city of Dallas shall have the power by ordinance to fix and regulate the price of water, gas and electric lights, and to regulate and fix the fares, tolls and charges of local telephones and exchanges, of public carriers and hacks, whether transporting passengers, freight or baggage, and generally to fix and regulate the rates, tolls or charges and the kind of service of all public utilities of every kind."

The declaration in the Constitution denying the right to make an uncontrollable grant, and making franchises subject to the control of the Legislature, coupled with the act of the Legislature in 1907, granting a charter to the city of Dallas containing in it authority to said city to regulate rates, clearly indicates that both the framers of the Constitution and the Legislature itself had in mind the necessity of changing public service rates from time to time. Therefore the city of Dallas could not, under the terms of its charter and the provisions of the Constitution, barter away its right to regulate and control at all times the rates to be charged and the service to be rendered by public utilities enjoying its franchises. A line of decisions upholds this doctrine.

The Court of Civil Appeals for the Fourth Supreme Judicial District of Texas first passed upon this question in the case of San Antonio Traction Co. v. Altgelt (Tex. Civ. App.) 81 S. W. 106. The Legislature enacted a statute providing that school children should be carried at half fare, which statute was attacked by the traction company on the ground that such statute violated the terms of its franchise from the city of San Antonio, and that such franchise was a binding contract and could not be abrogated. The appellate court held that the franchise did not constitute a fixed contract because of the provisions of the charter and the clause in the Constitution above quoted, and that such rates were subject to legislative and charter control. The Supreme Court of Texas denied a writ of error, and the case then went to the Supreme Court of the United States, which upheld the ruling of the Court of Civil Appeals. San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 Sup. Ct. 261, 50 L. Ed. 491. To the same effect are the rulings in San Antonio v. San Antonio Public Service Co., 255 U. S. 547, 41 Sup. Ct. 428, 65 L. Ed. 777; S. W. Tel. & Tel. Co. v. City of Dallas (Tex. Civ. App.) 174 S. W. 636.

As the franchise was not a fixed contract within the ordinary meaning of that word, it becomes necessary to inquire how such franchise can lawfully be altered or modified. Such is determined by the language of the charter of the city of Dallas. The power of legislation, generally, is vested by the charter in the mayor and board of commissioners, in article 3, § 1, which reads:

"All powers conferred upon the city shall, unless otherwise provided in this charter. be exercised by the mayor and four commissioners who, together, shall be known and designated as the board of commissioners."

The power to prescribe the kind of service to be rendered and the rates to be charged by public utilities is conferred by the charter on the board of commissioners in article 2, § 8, subsec. 7, which reads ·

"The right is hereby delegated to the city of Dallas, acting through its board of commissioners, to determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy a franchise or exercising any other public privilege in said city and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it shall be rendered, and from time to time alter or change such rules, regulations and compensation," etc.

The manner in which the board of commissioners shall enact regulatory ordinances is found in article 8, § 2, of the charter, which reads:

"No ordinance passed by the board of commissioners, except when otherwise required by the general laws of the state, or by the provisions of this charter respecting street improvements, and except an ordinance for the immediate preservation of the public peace, health or safety, which contains a statement of its urgency and is passed by a four-fifths vote of the board of commissioners (but no grant of any franchise shall be construed to be an emergency measure, but all franchises shall be subject to the referendary vote herein provided), shall go into effect thirty days from the time of its final passage and its approval by the mayor; and if during said thirty days a petition signed by electors of the city equal in number to at least fifteen per cent. of the entire vote cast for all candidates for mayor of the last preceding general election at which a mayor was elected, protesting against the passage of such ordinance, shall be presented to the board of commissioners, the same shall

thereupon be suspended from going into operation, and it shall be the duty of the board of commissioners, to reconsider such ordinance, and if the same is not entirely repealed the board of commissioners shall submit the ordinance, as is provided in section 1, of article 8 of this city charter, to the vote of the electors of the city, either at the next general election or at a special municipal election to be called for that purpose, and such ordinance shall not go into effect or become operative, unless a majority of the qualified electors voting on the same shall vote in favor thereof. Said petition shall ,be in all respects in accordance with the provisions of said section 1 of article 8, except as to the percentage of signers, and be examined and certified by the secretary, and in all respects as is therein provided."

[2] If the steps required by this last charter provision were followed by the board of commissioners in passing the regulatory ordinance of June 24, 1922, then such ordinance is valid and operative, otherwise it is not. In the first place, if the regulatory ordinance granted a franchise as contended by appellant, a referendum vote by the people of the city of Dallas approving the measure is necessary before it can go into effect. But, as the ordinance of January 8, 1917, granted the franchise and the ordinance of June 24, 1922, merely altered the rate schedule prescribed in section 24 of the franchise, it does not come within that class of ordinances requiring a referendum on that ground. If a referendum is necessary, it must be for another and different reason. City of Dallas v. Gill (Tex. Civ. App.) 199 S. W. 1144; State ex rel. Jackson v. Redding, 84 Kan. 654, 114 Pac. 1094; State ex rel. Leisk v. Common Council, 124 Wis. 451, 102 N. W. 894; Western Union Tel. Co. v. City of Visalia, 149 Cal. 144, 87 Pac. 1023; Overholser v. Oklahoma Interurban Traction Co., 29 Okl. 571, 119 Pac. 128.

In the next place, if the ordinance comes within one of the exceptions where an emergency exists requiring the taking of effect at once, it may be passed without a referendum and become immediately operative. Article 8, § 2, of the charter above quoted names the three exceptions which authorize the board of commissioners to declare an emergency and to enact an ordinance which will take effect at once. They are those for the immediate preservation of the public peace, health, or safety; those excepted by the charter in respect to street improvements; and those otherwise required by the general laws of the state. Appellee contends that this ordinance comes within these exceptions, and that the ordinance itself having so stated, its declaration to that effect is binding and conclusive, and not subject to judicial review.

Section 8 of said regulatory ordinance reads:

"Whereas, for the purpose of increasing more adequate street car facilities and to promote greater convenience to the general public during the' present temporary emergency, there arises and is created an urgency and an emergency in behalf of the public comfort, peace, health and safety that this ordinance become effective immediately, and it is therefore accordingly so ordained that this ordinance shall become effective immediately upon its passage as in the charter in such cases made and provided."

[3] It is clear from this ordinance that the emergency clause is invoked on the theory that the immediate preservation of the public peace, health and safety require it. Hence, if this exception creating such emergency existed, the board of 'commissioners had the right to so declare, its declaration would be conclusive and not subject to review, the ordinance would take effect immediately, and there would exist no right of referendum. But the board of commissioners is not authorized to declare that an emergency exists except in the three cases enumerated in the charter, and when such board exceeds its authority and declares an emergency, whether it gives its reasons therefor or not, if there is in fact no such emergency, and none of the three charter exceptions actually exist, then its action is not binding and conclusive but is subject to judicial review and determination.

The courts have defined "public peace" to mean "that quiet, order and freedom from disturbance guaranteed by law," and laws regarding "public safety" to mean such as are "allied in their application and effect to those enacted to promote the public peace, preserve order and provide that security to individuals which comes from observance of law." "By public health is meant the wholesome, sanitary condition of the community at large." "The word preservation presupposes a real or existing danger, and immediate preservation is indicative of a present impelling necessity with nothing intervening to prevent the removal of the danger." 1 Blackstone's Commentaries, 122; State v. Becker (Mo. Sup.) 233 S. W. 649.

[4] It is readily apparent that the public peace is not involved in raising or lowering street car fares. Nor is a measure which enriches or depletes the treasury of a public utility more than $500 a day one that endangers the public safety. Neither can it be said that the public health will be at all affected whether this ordinance becomes operative at the end of the usual 30 days or if it immediately takes effect. In no event is the immediate preservation of the public peace, health or safety at stake so as to require a suspension of the ordinary methods of putting ordinances into effect.

The purpose of the initiative was to give

the people the right and the method of having the lawmaking body of the government enact their will into law. The purpose of the referendum was to empower the people with the authority to reject undesired legislation. The right of the people to a referendum on municipal legislation cannot be denied except in those instances coming clearly within one of the exceptions named in the charter. Nor can a measure be lawfully passed with a provision that it shall take effect within less time than 30 days, unless under one of the exceptions provided for in the charter. Therefore, as the ordinance did not come within one of the charter exceptions, and as no emergency existed, or could possibly exist, the declaration of the board of commissioners could not, by declaring so, make the exception or the emergency or put the ordinance into effect until it had been published 30 days as the charter requires. The authorities are overwhelmingly to this effect.

In State v. Whisman, 36 S. D. 274, 154 N. W. 711, L. R. A. 1917B, 1, the Supreme Court of South Dakota, in passing upon this very question, says:

"As to all emergency measures and acts within the purview of this exception, the Legislature may declare an emergency to exist, for the purpose and to the end that such enactment may at once go into effect, and such declaration and finding as to the existence of such emergency is final, and not within the power or province of the courts to question. But as to any measure, law, or enactment clearly not within the class of emergency measures specified within said exception, the Legislature has no power or authority to declare an emergency to exist in relation thereto, by any vote, however large the same may be; and the action of the Legislature in embodying emergency clauses in measures clearly not comprehended within the said exception are wholly unwarranted and void, and should be so held by the courts. Not that the act itself would be void, but the emergency clause would be void, with the result that the act would not go into effect until the 1st day of next July, and also with the result that, in the event of a proper referendum petition being filed as required by law, such enactment would not go into effect until approved by a majority vote of the electors of the state."

In State v. Becker, 233 S. W. 645, the Supreme Court of Missouri uses the following language:

"I concur in the law announced by our Brother Woodson in this case. He adopts what the writer said in paragraph 5 of the opinion in the case of State ex rel. Westhues et al. v. Sullivan, 224 S. W. loc. cit. 337 et seq. We there ruled upon what appeared to us to be the weight of authority, and the very reason of the matter that the Legislature, under section 57 of article 4 of our Constitution, could not close judicial determination as to the real character of any law, by saying that such law was 'necessary for the immediate preservation of the public peace, health or safety' of the state. We further said that this court could examine the face of the legislative act, and if in fact it was not for 'the immediate preservation of the public peace, health or safety' of the state, we could and would declare the legislative declaration, to the effect that it was 'necessary for the immediate preservation of the public peace, health or safety' of the state, void and of no effect, as being in conflict with said constitutional provision, and the spirit thereof."

In Ex parte Hoffman, 155 Cal. 119, 99 Pac. 519, 132 Am. St. Rep. 75, the Supreme Court of California deal with this same question in the following language:

"This ordinance declared (section 18) that 'it is urgently required for the immediate preservation of the public peace, health and safety.' It is contended that the provision under consideration can by no possibility be one required for the immediate preservation of the public peace, health, or safety, that the declaration of the council to that effect is of no binding force, and that the ordinance therefore is a bold attempt to destroy the right to the referendum preserved to the people in section 198b, above quoted. We agree that it cannot be a matter for the immediate preservation of the public health that milk vended must contain 3.5 per centum of milk fat instead of 3 per centum, and that the total amount of water shall be 84.5 instead of 85 per centum. Furthermore, we agree that the mere declaration of the council in such a case that the ordinance is passed for the immediate preservation of the public health is neither conclusive nor yet sufficient. The nature of the ordinance itself will, in most instances, be determinative, and where a sudden emergency has arisen, a statement of the nature of the urgency finds proper place to support the declaration. So says the Supreme Court in Wheeler v. Chubbuck, 16 Ill. 364, in discussing the effect of the emergency clause necessary to put a law into immediate force: 'But such direction must be made in a clear, distinct, and unequivocal provision, and cannot be helped out by any sort of intendment or implication.' But, conceding this, the effect of the concession is not to destroy the ordinance. By the very terms of the charter, if the ordinance be not one of emergency, the date of its operation is postponed for 30 days."

The holding of the Supreme Court of Washington in State ex rel. Brislawn v. Meath, reported in 84 Wash. 307, 147 Pac. 13, is to the following effect:

"Now there is no more reason for saying that a bill is an emergent measure, when upon its face it is not, and from the very nature of its subject-matter cannot be, just because the Legislature has said it is so, than there is for declaring a law to be unconstitutional when it has been passed by the Legislature with the Constitution and its limitations lying open before it. The sense and discretion of the Legislature, as well as its power to discriminate

between an act falling clearly without and one falling clearly within the Constitution, should, if we are consistent, be given the same weight as a declaration that an act is emergent," etc.

We could quote from many other cases, particularly from State v. Stewart, 57 Mont. 144, 187 Pac. 641; Attorney' General v. Lindsay, 178 Mich. 524, 145 N. W. 99; Rigdon v. Common Council, 30 Cal. App. 107, 157 Pac. 513; State v. Sullivan, 283 Mo. 546, 224 S. W. 334; Merrill v. City of Lowell, 236 Mass. 463, 128 N. E. 862; Payne v. Graham, 118 Me. 251, 107 Atl. 709, 7 A. L. R. 516; but to do so would be but to reiterate the reason for the rule.

[5] We conclude that a franchise is not a fixed contract but one subject to constant regulation by the governing body. of the municipality granting it; that the ordinance involved in this case was not one granting a franchise but one regulating the rate schedule; that such regulatory ordinance could not go into effect immediately because none of the exceptions creating an emergency existed; that the suspension of the prescribed method of passing ordinances was not required for the immediate preservation of the public peace, health, or safety; that the declaration of the board of commissioners declaring an emergency did not create such emergency, was not binding and conclusive, but was subject to judicial ascertainment; that the emergency clause in the ordinance in question is void, but that the ordinance itself is not void but merely inoperative until it shall have been published for the 30 days required by law. And if, within such 30 days a referendum is demanded by the electorate of the city of Dallas in the manner provided in article 8, § 2 of the city charter, then such referendum must be held and the ordinance ratified by the people before it will take effect.

[6] Appellant had no adequate legal remedy by mandamus, because the declaration of an emergency, coupled with the provision that the ordinance should take immediate effect, cut off his right to file his protest and to proceed under it.

It may be that the proceeds accruing to the street car company under the five-cent schedule are wholly insufficient to enable it to make the necessary returns on its investment and to properly carry on its business, but, if such is a fact, this can be shown to the electorate, in whom the power of referendum resides, and the people will see that a just and fair rate is fixed, not confiscatory but adequate.

The judgment of the trial court sustaining appellee's general demurrer and special exceptions is here reversed, and this cause remanded to such court for trial on its merits.

Reversed and remanded.